Trevor B. Rockstad
trevor.rockstad@daviscrump.com
On Behalf of Wayne Rogers (Plaintiff)
CBN: 277274
Davis & Crump, P.C.
2601 14th Street
Gulfport, MS 39501
Ph: 228-863-6000

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WAYNE ROGERS<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION<br><br>A member of MDL 3181:<br><br>IN RE BOSTON SCIENTIFIC CORPORATION SPINAL CORD STIMULATOR PRODUCTS LIABILITY LITIGATION | Case No.<br><br>Case No. 2:26-MD-3181-JLS |

## COMPLAINT

Plaintiffs, by and through undersigned counsel, brings this Complaint against Defendant Boston Scientific Corporation and alleges as follows. In addition to the allegations below, Plaintiff also incorporates the Master Complaint that will be filed by Plaintiffs in this Multidistrict Litigation.

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Wayne Rogers ("Plaintiff") is and was at all relevant times a resident of Arizona. Plaintiff was implanted with a spinal cord stimulator ("SCS") system designed, manufactured, and distributed by Defendant Boston Scientific Corporation.

2. Plaintiff files this complaint pursuant to this Court's Pretrial Orders No. 3 and No. 4 in 2:26-ml-03181, and hereby designates the District of Arizona as the venue in which he would have filed this complaint absent these Pretrial Orders.

3. Defendant Boston Scientific Corporation ("Boston Scientific") is a corporation organized under the laws of the State of Delaware. Boston Scientific is registered and interacts with the Food and Drug Administration through its offices located at 25155 Rye Canyon Loop, Valencia, CA 91355. Boston Scientific conducts business nationwide and within this District, including the design, manufacture, regulatory submission, and distribution of Class III neuromodulation devices, such as its spinal cord stimulator systems marketed under the trade names WaveWriter Alpha  and other similar devices.

4. Venue is proper in this district pursuant to this Court's Pretrial Order No. 4: Direct Filing Order in Case No. 2:26-ml-03181.

5. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and the parties are citizens of different states.

6. This Court has personal jurisdiction over Boston Scientific because it maintains significant offices and personnel in this District and regularly conducts and solicits business, and derives substantial revenue from the design, manufacture, and sale of spinal cord stimulators and related services within this District.

## II. FACTUAL ALLEGATIONS REGARDING BOSTON SCIENTIFIC SCS DEVICES AND REGULATORY HISTORY

### A. Overview of Spinal Cord Stimulation Devices and Their Intended Use

7. SCS devices are Class III implantable neuromodulation systems designed to deliver electrical impulses to the spinal cord to mask or modulate chronic intractable pain. SCS systems typically consist of an implantable pulse generator (IPG), one or more electrical leads, and external patient controllers for adjusting therapeutic levels.

8. The underlying therapeutic premise of SCS devices is that electrical stimulation of the dorsal columns can "override" or "mask" the transmission of pain signals to the brain, thereby providing relief for chronic pain conditions that are otherwise resistant to conventional treatments.

9. SCS devices have long been associated with complex risks, including but not limited to device migration, lead breakage, battery failure, infection,

stimulation-induced neurological deficits, exacerbation of pain, and autonomic dysfunction.

10. Due to these inherent risks, SCS devices are classified by the FDA as Class III medical devices, requiring Premarket Approval ("PMA") or PMA supplement review for any design or functional changes affecting the safety and effectiveness of the device.

11. These devices are also associated with significant complications and poor clinical results, including inadequate effectiveness in providing the pain relief they promise. In September 2020, in response to a Public Citizen report, the FDA issued a letter to healthcare providers advising that, during the preceding four-year period, it had received 107,728 adverse event reports regarding spinal cord stimulators. The letter also disclosed 30,321 reports of unsatisfactory pain relief.

**B. Boston Scientific's Device Portfolio and Regulatory Approval History**

12. The Federal Food, Drug & Cosmetic Act ("FDCA") sets forth the requirements for Premarket Approval, which is necessary for the commercialization of a high-risk Class III device such as the device at issue in this case.

13. Among the aforesaid requirements is the requirement to provide the FDA with adequate clinical data to support a finding of sufficient safety and efficacy of the subject device.

14. The FDCA's implementing regulations require that an applicant for premarket approval of a device submit, with respect to the device proposed to be marketed:

> results of the clinical investigations involving human subjects with the device including clinical protocols, number of investigators and subjects per investigator, subject selection and exclusion criteria, study population, study period, safety and effectiveness data, adverse reactions and complications [...]

15. Boston Scientific's spinal cord stimulator product line originates from and is, for all intents and purposes, predicated on PMA P030017, initially approved by the FDA in 2004 for its Precision Spinal Cord Stimulator System.

16. PMA P030017 was awarded despite the applicant's failure to supply the data required by 21 CFR §814.20.

17. Instead, the referenced PMA was granted following submission of clinical data from "available peer reviewed published literature for similar implantable spinal cord stimulation (SCS) systems."

18. Boston Scientific did not submit clinical data or clinical evidence for the Precision system, or for any subsequent BSC system that used the Precision as a predicate product for marketing purposes.

19. Thus, the defining parameter for the grant of premarket approval of a medical device has never been met with respect to the device at issue in this case, or any other Boston Scientific SCS system for that matter.

20. Since the original approval of P030017, Boston Scientific has introduced numerous subsequent models and upgrades under PMA supplements, including the Precision Plus, WaveWriter Alpha, Precision Montage, Spectra WaveWriter, and WaveWriter Alpha systems.

21. Since the original approval of P030017, Boston Scientific has filed 362 supplements to P030017.

22. Boston Scientific's newer generations of devices incorporated significant modifications, including multiwaveform stimulation (simultaneous tonic, burst, and sub-perception modes), posture-adaptive programming, expanded electrode arrays, Bluetooth-enabled programming, and major revisions to battery architecture and lead designs.

23. None of these systems are supported by premarket clinical data supporting safety or effectiveness.

24. Boston Scientific aggressively marketed its WaveWriter Alpha system and other upgraded models as offering superior pain relief through innovative stimulation patterns, despite the absence of independent premarket clinical testing validating the long-term safety and effectiveness of these substantial modifications.

### C. Material Changes to Device Architecture and Functionality

25. Over time, Boston Scientific introduced substantial modifications to the originally approved Precision SCS system, including:

- The addition of simultaneous multiwaveform stimulation, including tonic, burst, and sub-perception programming;

- The redesign of the implantable pulse generator battery system and the addition of Bluetooth-enabled wireless communication capabilities;
- The integration of posture-adaptive stimulation algorithms;
- The expansion of lead configurations and multi-source current delivery systems.

26. These substantial modifications materially altered the device's safety and effectiveness profile compared to the originally approved Precision system, triggering regulatory obligations that Boston Scientific failed to fulfill.

27. Under 21 C.F.R. § 814.39(a), such significant changes require submission of a new PMA or substantial clinical data demonstrating continued safety and effectiveness. Boston Scientific failed to pursue a new PMA review for these cumulative design changes and failed to provide substantial clinical data demonstrating continued safety and effectiveness, and instead improperly utilized the PMA supplement pathway.

28. The WaveWriter Alpha devices implanted in Plaintiff are technologically unrecognizable from the Precision system that was originally approved by the FDA in 2004.

29. Throughout its history in the neuromodulation space, BSC has conflated the PMA approval process with the less onerous and demanding 510k clearance process.

**D. Regulatory Manipulation and Abuse of the PMA Supplement Process**

30. Boston Scientific submitted successive PMA supplements treating major modifications as discrete "minor" changes to avoid the heightened scrutiny, public transparency, and rigorous independent clinical evaluation required for new PMA applications.

31. This regulatory strategy deprived physicians, patients, and the FDA of complete information necessary to evaluate the true risks associated with the modified devices, particularly in the areas of neurological safety, device longevity device effectiveness, stimulation safety, and autonomic complications.

32. As a direct consequence of these omissions and regulatory manipulations, the WaveWriter Alpha and other successor systems entered the market and were widely implanted without sufficient scientific validation of their safety and effectiveness.

**E. Post-Market Failures, Adverse Events, and Concealment of Risks**

33. Publicly available MAUDE (Manufacturer and User Facility Device Experience) database entries, peer-reviewed studies, and post-market surveillance data demonstrate that Boston Scientific's SCS systems are associated with serious complications, including:

- Unsatisfactory pain relief;
- Device migration and loss of therapeutic coverage;
- Lead fractures requiring surgical revision;
- Battery depletion and communication failures;
- Stimulation-induced autonomic dysfunction, including urinary incontinence and orthostatic hypotension;
- Persistent ineffective pain relief despite extensive reprogramming.

34. Peer-reviewed literature has increasingly associated SCS therapy, particularly multiwaveform stimulation platforms like the Precision Montage MRI, with unexpected autonomic side effects. *See*, e.g., Steven Smeijers et al., Spinal Cord Stimulation and Urinary Dysfunction, 23 Pain Med. 1204, 1204–1216 (2022).

35. A 2023 Cochrane Review led by University of Sydney researchers found that, based on all randomized controlled trials and cross-over trials comparing SCS with placebo or no treatment for low back pain, current evidence suggests that SCS probably does not have sustained clinical benefits that would outweigh the costs and risks of this surgical intervention. *See* Traeger AC, Gilbert SE, Harris IA, Maher CG. Spinal cord stimulation for low back pain. Cochrane Database of Systematic Reviews 2023, Issue 3. Art. No.: CD014789. DOI: 10.1002/14651858.CD014789.pub2. Accessed 08 January 2026.

36. Despite knowledge of these adverse outcomes, Boston Scientific failed to timely update device labeling, issue field safety notices, or seek revised PMA approvals as required under federal regulations.

37. Of note, Boston Scientific has never conducted randomized, double-blind, placebo-controlled studies on any of its SCS devices.

38. Plaintiff's injuries occurred as a direct and foreseeable result of Defendant Boston Scientific's conduct as set forth herein.

## III. REGULATORY FRAMEWORK AND DUTIES

39. Spinal cord stimulator (SCS) systems are regulated as Class III medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21

U.S.C. § 301 et seq., and the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c et seq.

40. Class III devices are those that present the highest risk to patients and are subject to the most rigorous form of regulatory oversight, including the requirement to obtain Premarket Approval from the FDA prior to marketing. *See* 21 U.S.C. § 360e.

41. To obtain PMA, a manufacturer must submit detailed information demonstrating the safety and effectiveness of the device, including clinical trial data, descriptions of manufacturing methods, proposed labeling, and a risk-benefit analysis. *See* 21 C.F.R. § 814.20.

42. Once a PMA is granted, any proposed changes to the device's design, labeling, intended use, or manufacturing process must be submitted to the FDA as a PMA supplement. *See* 21 C.F.R. § 814.39(a).

43. The MDA distinguishes between different types of PMA supplements based on the nature and significance of the change. A "panel-track supplement" is required for changes that affect the safety or effectiveness of the device, such as new indications for use, major design modifications, or significant changes in component materials. *See* 21 C.F.R. § 814.39(c).

44. For any change that could affect safety or effectiveness, the FDA must receive and approve the PMA supplement before the manufacturer implements the change. *Id.* The burden of proof remains with the manufacturer to demonstrate that the modified device continues to be safe and effective.

45. Manufacturers are also required to comply with post-market surveillance and reporting obligations, including:

- Timely submission of adverse event reports under 21 C.F.R. § 803.50;
- Maintenance of complaint files under 21 C.F.R. § 820.198;
- Evaluation of nonconforming products under 21 C.F.R. § 820.90;
- Implementation of corrective and preventive actions under 21 C.F.R. § 820.100.

46. These regulatory obligations are non-discretionary and enforceable under both federal and state law. A manufacturer's failure to comply with these requirements renders its device adulterated or misbranded under 21 U.S.C. §§ 351 and 352.

47. Plaintiff does not seek to enforce the FDCA directly. Rather, Plaintiff asserts state-law tort claims based on duties that parallel and incorporate federal requirements, as recognized in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), and as preserved under 21 U.S.C. § 360k(a).

48. These state-law claims are not preempted by the MDA because they are premised on conduct that violates both federal law and equivalent duties imposed by Arizona law.

## IV. PLAINTIFF-SPECIFIC ALLEGATIONS

49. Plaintiff Wayne Rogers is a resident of Arizona.

50. On June 27, 2024, Plaintiff underwent implantation of a Boston Scientific spinal cord stimulator system. The implanted system included a

WaveWriter Alpha implantable pulse generator, along with Boston Scientific leads and anchoring components.

51. Plaintiff experienced initial pain relief from the SCS device, but later experienced a decline in pain relief, worsened pain, unexpected shocking, and uncomfortable tingling in his feet.

52. Plaintiff has not yet had a surgery to remove the WaveWriter Alpha device, but has turned the SCS device off. He intends to have the device removed.

53. Plaintiff's spinal cord stimulator was implanted for the treatment of chronic pain.

54. Prior to deciding to have the SCS systems implanted, Plaintiff met multiple times with Boston Scientific sales representatives, including a representatives named Ashley and Clint (last names unknown).

55. Throughout the time period starting with his first contact with a Boston Scientific representative through recent months, Plaintiff had direct contact with Boston Scientific representatives.

56. Before being permanently implanted with the SCS system, Plaintiff underwent a temporary spinal cord stimulator trial.

57. Prior to the SCS trial, Plaintiff was advised by Boston Scientific sales representatives that the permanent SCS device would provide reliable, long-term pain relief and that stimulation was safe and localized. No warnings were given regarding the risk of shocking, the possibility that the permanent device differed materially from the external trial unit, or the likelihood that the SCS system would not provide meaningful, long-term pain relief. In fact, the Boston Scientific

representative represented to Plaintiff that the permanent SCS system would provide equivalent pain relief to the temporary SCS trial, and would provide consistent long-term pain relief.

58. During the SCS trial, Plaintiff communicated with a Boston Scientific representative regarding the efficacy of the trial stimulator unit.

59. At the end of the SCS trial, Plaintiff reported sufficient pain relief for insurance to cover the permanent device.

60. Plaintiff and his providers were not informed that the original PMA that led to the WaveWriter Alpha system being on the market (PMA P030017) was not supported by clinical trial data or that it was approved based on literature relating to other spinal cord stimulator devices.

61. Plaintiff and his providers were also not informed that the WaveWriter Alpha system, including its multiwaveform stimulation capabilities and revised battery architecture, had not undergone independent clinical validation via a new PMA application, and instead reached the market through piecemeal PMA supplement filings.

62. Plaintiff relied on Boston Scientific's representations, through both direct promotional materials and the direct spoken representations by the Boston Scientific sales representatives in deciding to proceed with the initial implantation of the SCS system.

63. Specifically, Plaintiff relied on Boston Scientific's representations, among others, that the SCS system was uniquely suited to provide him with long-term pain relief and was safe for long-term implantation, that the system was

supported by clinical data, and that the permanent SCS system would provide equivalent pain relief to the temporary SCS trial.

64. The representations relied upon by Plaintiff are still being made by Boston Scientific about the WaveWriter Alpha to this day.

65. Plaintiff's interactions with Boston Scientific's representatives, including Ashley and Clint (last names unknown) were so substantial that Plaintiff alleges that they directly sold him the WaveWriter Alpha system.

66. A Boston Scientific representative was present at the surgery facility on the days of Plaintiff's permanent implant surgeries, and programmed the devices during or immediately after the implant surgeries.

67. On multiple occasions, Plaintiff was required to undergo reprogramming of the SCS devices by Boston Scientific representatives due to unsatisfactory pain relief and complications.

68. On the occasions that he had the SCS device reprogrammed, the Boston Scientific sales representatives represented to Plaintiff that reprogramming of the SCS systems after they were implanted was necessary to ensure that he received optimal pain relief and to avoid the complications he was experiencing, and that if he was not receiving adequate pain relief or experiencing these side effects, he just needed to have the systems reprogrammed. Therefore, Plaintiff did not have any reason to know that he should not expect the device to work properly and provide the promised results on the dates that he had the device reprogrammed.

69. The permanent SCS system did not provide equivalent pain relief to Plaintiff's temporary SCS trial.

70. During the time in which the SCS system was implanted in Plaintiff, Boston Scientific representatives, believed to be unlicensed in the State of Arizona, or elsewhere for that matter, actively participated in programming and waveform selection. These actions involved real-time interpretation of patient responses and materially influenced the configuration and function of the implanted system. These actions were essentially medical treatment and had a significant impact on the way the SCS system affected Plaintiff's body.

71. Plaintiff was advised that Boston Scientific representatives were the only individuals who could or would program or reprogram his SCS device.

72. During the time in which the SCS system was implanted in Plaintiff, Boston Scientific representatives provided medical advice to him about the SCS system.

73. After the SCS system was removed, Plaintiff continued to experience pain and complications. He experiences complications to this day, due to nerve damage caused by the SCS system.

74. Plaintiff relied on representations made and advice given by Boston Scientific representatives after he was implanted with the SCS system in electing to keep the system implanted in his body. If not for these representations and the purported medical advice provided by the Boston Scientific representatives, Plaintiff would have elected to have the system removed earlier and would have avoided much of the pain and suffering that he ultimately endured. Specifically, if

the representatives had not convinced him to keep the faulty device in his body, he would have had it removed immediately and would likely have avoided the nerve damage he ultimately suffered.

75. Due to the misrepresentations made by Boston Scientific to Plaintiffs physicians, it has been more difficult for him to get his physicians to remove the SCS device.

76. Plaintiff did not learn of the likely connection between his injuries and the defective nature of Boston Scientific's SCS system until he reviewed publicly available FDA documents, adverse event disclosures, and litigation-related findings that contradicted prior assurances of safety, efficacy, and regulatory compliance. Further, he did not and could not have known that any of Boston Scientific's representations were false until he made the decision in March 2025 to turn the SCS device off.

77. Boston Scientific's tortious conduct continued through the date on which Plaintiff ultimately had the Boston Scientific SCS system removed from his body, as Boston Scientific sales representatives continued to make misrepresentations to him, continued to reprogram the SCS system, and gave medical advice to him about the SCS system.

78. Plaintiff's injuries, including physical pain, emotional distress, surgical trauma, loss of enjoyment of life, and the permanent implantation of defective hardware, were directly and proximately caused by the acts and omissions of Boston Scientific.

79. As a result of the SCS device that was implanted in him, Plaintiff experienced cognitive complications, including poor balance and falls, autonomic dysfunction, worsened pain, neurological injury, and unsatisfactory pain relief.

## V. DEFENDANTS' MISREPRESENTATIONS, OMISSIONS, AND REGULATORY VIOLATIONS

### A. Failure to Disclose Material Risks and Regulatory Evasion

80. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

81. At all relevant times, Defendant Boston Scientific Corporation engaged in a course of conduct designed to conceal material risks associated with its spinal cord stimulator systems, misrepresent the safety and efficacy of its devices, and improperly utilize the PMA supplement process to introduce significant, unvalidated design changes without triggering mandatory premarket review.

82. Boston Scientific represented to Plaintiff, his healthcare providers, and the medical community that its SCS system and related devices were safe, effective, supported by clinical data, and appropriately approved for long-term implantation.

83. These representations were false, misleading, and incomplete. Boston Scientific knew, or should have known through post-market surveillance and regulatory obligations, that the WaveWriter Alpha system:

- Was not supported by clinical data;

- Posed an increased risk of device migration, stimulation failure, and neurological injury;
- Was marketed with stimulation modalities not adequately tested in clinical trials;
- Carried a known risk of autonomic dysfunction, including incontinence, hypotension, and cardiac arrhythmia;
- Had materially different performance characteristics from the external trial device, upon which ultimate treatment predictions and decisions were made.

84. Boston Scientific actively concealed this information by:

- Failing to conduct clinical trials and submit meaningful clinical data to the FDA as required by 21 U.S.C. § 360e(d) and 21 CFR § 814.20.
- Failing to report adverse events under 21 C.F.R. § 803.50;
- Withholding labeling updates and field safety communications under 21 C.F.R. § 814.39(d);
- Submitting fragmented PMA supplements to avoid full panel-track review required by 21 C.F.R. § 814.39(a).

85. These actions violated non-discretionary regulatory obligations and rendered the device unsafe for its intended use and deprived physicians and patients of information required for informed medical decision-making.

**B. Violations of Current Good Manufacturing Practices (cGMPs)**

86. In addition to the above, Boston Scientific violated multiple cGMP requirements codified at 21 C.F.R. Part 820 — including those governing design

control, process validation, complaint handling, and corrective and preventive action (CAPA).

87. Specifically, Boston Scientific:

- Failed to maintain adequate design validation under 21 C.F.R. § 820.30(g), particularly in light of the software and waveform changes introduced with the WaveWriter Alpha system;
- Failed to validate and monitor manufacturing processes as required under 21 C.F.R. § 820.75, leading to inconsistencies in lead bonding and IPG housing integrity;
- Failed to investigate and correct known device performance issues through its CAPA system, in violation of 21 C.F.R. § 820.100;
- Failed to evaluate post-market complaints systematically and incorporate them into product redesign and labeling revisions, in violation of 21 C.F.R. § 820.198.

88. These cGMP violations are not discretionary; they are binding legal obligations imposed by the FDA to ensure the safety and effectiveness of devices. They establish minimum standards for medical device manufacturers and are incorporated by reference into Arizona tort law as parallel duties.

89. Boston Scientific's violation of these cGMP requirements caused Plaintiffs' injuries described herein. It was reasonably foreseeable that these violations would cause injury to Plaintiff and others. Specifically, these violations resulted in an unsafe product being marketed to Plaintiff and deprived Plaintiff and his physicians of important information about the safety and efficacy of the device at issue.

90. The Ninth Circuit has expressly recognized that manufacturers of FDA-regulated medical devices may be held liable under state law where they violate non-discretionary FDA regulations, including those arising under cGMPs. *See Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1233–34 (9th Cir. 2013) (*en banc*).

91. Boston Scientific's repeated and willful violations of cGMP requirements caused or substantially contributed to the defects and injuries at issue in this case, and support Plaintiff's claims under Arizona law.

92. These claims are not preempted under *Riegel* or *Buckman* because they are premised on state-law duties that genuinely parallel federal requirements and do not exist solely by virtue of the FDCA.

## VI. CAUSES OF ACTION

### COUNT I – MANUFACTURING DEFECT

93. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

94. At all relevant times, Defendant Boston Scientific Corporation was engaged in the design, manufacture, labeling, marketing, and distribution of spinal cord stimulator systems throughout the United States, including the WaveWriter Alpha system implanted in Plaintiff.

95. Under Arizona law, a product is unreasonably dangerous because of a manufacturing defect if it was not manufactured according to its intended design and fails to perform as safely as an ordinary consumer would expect.

96. The spinal cord stimulator system implanted in Plaintiff was not reasonably safe as manufactured. It deviated materially from its intended design

specifications and from applicable federal requirements governing Class III medical devices.

97. Defendant Boston Scientific violated non-discretionary federal manufacturing and quality system regulations, including but not limited to:

- 21 C.F.R. § 820.30: failure to implement adequate design controls;
- 21 C.F.R. § 820.70: failure to establish process controls ensuring conformity to design specifications;
- 21 C.F.R. § 820.75: failure to validate manufacturing processes capable of consistently producing conforming devices;
- 21 C.F.R. § 820.100: failure to implement corrective and preventive action in response to known device defects.

98. The spinal cord stimulator system implanted in Plaintiff was manufactured with latent defects affecting performance, stability, and safety, including but not limited to:

- Inadequate lead anchoring, resulting in migration, therapeutic failure, and unwanted shocking in patients;
- Battery instability contributing to irregular stimulation output and early depletion, including need for battery replacement;
- Defects impacting the physical stability of the battery in the bodies of patients;
- Faulty firmware or programming inconsistencies affecting waveform delivery, and causing complications in patients, including shocking and unsatisfactory pain relief.

99. These defects were not detectable by Plaintiff or his physicians through reasonable inspection prior to implantation and were not reasonably

foreseeable based on the information available to Plaintiff or his treating physicians at the time.

100. As a direct and proximate result of the manufacturing defects described herein, Plaintiff suffered the injuries, damages, and losses set forth above, including physical pain and suffering, emotional distress, medical expenses, permanent injury, lost income, additional surgical intervention, and diminished enjoyment of life.

101. Plaintiff's manufacturing defect claim arises under state-law duties that parallel federal manufacturing obligations imposed on Boston Scientific. These claims are not expressly or impliedly preempted under 21 U.S.C. § 360k(a), *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), or *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT II – FAILURE TO WARN

102. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

103. At all relevant times, Defendant Boston Scientific Corporation was engaged in the design, manufacture, labeling, marketing, and distribution of spinal cord stimulator systems throughout the United States, including the WaveWriter Alpha system implanted in Plaintiff.

104. Under Arizona law, a manufacturer is liable for failing to provide adequate warnings about known or reasonably knowable risks associated with the ordinary use of its product.

105. Boston Scientific had a duty to warn Plaintiff, his healthcare providers, and the medical community of the material risks associated with its spinal cord stimulator systems, including but not limited to:

- The risk of lead migration and device failure requiring surgical revision;
- The risk of autonomic dysfunction, including arrhythmias, urinary incontinence, and hypotension, and neurological injury;
- The risk that the trial device would not reliably predict the performance of the permanently implanted device;
- The risk of device-related pain exacerbation, shocking complications, nerve damage, and loss of therapeutic efficacy over time.

106. Boston Scientific breached its duty to warn by:

- Failing to update product labeling and Instructions for Use (IFU) to reflect emerging adverse event trends in the nearly twenty years since PMA P030017 was initially approved;
- Failing to disseminate "Dear Doctor" letters or field advisories warning of known failure modes that arose since PMA P030017 was approved;
- Failing to adequately train sales representatives and clinicians regarding the safety and efficacy limitations of multiwaveform stimulation, and the WaveWriter Alpha system generally;

- Actively promoting the WaveWriter Alpha system as superior, effective, and safe without disclosing material limitations and risks;
- Actively promoting the permanent WaveWriter Alpha as superior or equivalent in efficacy to temporary trial SCS.

107. These failures were compounded by violations of federal law, including:

- 21 C.F.R. § 803.50: failure to timely report adverse events;
- 21 C.F.R. § 814.39: failure to submit PMA supplements for significant changes;
- 21 C.F.R. § 820.198: failure to investigate and address post-market complaints.

108. Through its sales representatives, Boston Scientific downplayed and undermined the FDA approved labeling and warnings for its SCS systems, including risks and side effects contained in the FDA approved labeling and warnings, in contravention of the FDCA and implementing regulations. As a result, the warnings conveyed to Plaintiff and his physicians were inadequate under Arizona state law.

109. Plaintiff and his physicians justifiably relied on Defendant's representations and omissions.

110. Had appropriate warnings been provided, Plaintiff would not have consented to implantation.

111. As a direct and proximate result, Plaintiff suffered injuries including physical pain, emotional distress, surgical revision, and economic loss.

112. These claims are not preempted because they are based on parallel state-law duties that mirror federal requirements.

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, attorneys' fees where permitted, costs of suit, interest, and all such further relief as the Court deems just and proper.

## COUNT III – NEGLIGENCE PER SE AND BREACH OF FEDERAL REGULATORY DUTIES

113. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

114. At all relevant times, Defendant Boston Scientific Corporation owed duties to Plaintiff, his healthcare providers, and the public to comply with federal medical device regulations and to manufacture, monitor, and report on its spinal cord stimulator systems in accordance with Current Good Manufacturing Practices ("cGMPs") set forth in 21 C.F.R. Part 820.

115. These cGMP requirements are not discretionary. They impose binding legal obligations to implement and maintain design controls, process validation, complaint handling systems, and corrective and preventive actions for Class III medical devices.

116. Defendant breached these duties by failing to:

- Implement effective design validation under 21 C.F.R. § 820.30(g);
- Validate and monitor production processes under 21 C.F.R. § 820.75;

- Respond adequately to known product failures through its Corrective and Preventive Action (CAPA) system in violation of 21 C.F.R. § 820.100;
- Investigate and act upon post-market complaints in accordance with 21 C.F.R. § 820.198.

117. These regulatory breaches materially contributed to the manufacture, release, and continued distribution of unsafe, unvalidated, and defectively designed spinal cord stimulator systems that failed during normal use, including the WaveWriter Alpha system implanted in Plaintiff.

118. Plaintiff and his physicians were members of the class of individuals the cGMP regulations were intended to protect — users of Class III implanted medical devices.

119. The harms suffered by Plaintiff, including physical pain, device failure, revision surgery, and ongoing neurological complications, are of the precise type that the cGMP regulations are intended to prevent.

120. Defendant's violations of mandatory federal regulations constitute negligence per se under Arizona law.

121. As a direct and proximate result of these regulatory violations, Plaintiff suffered physical injuries, including permanent injuries, emotional distress, medical costs, diminished enjoyment of life, additional surgical intervention, and other compensable harms.

122. These claims arise under state-law duties that genuinely parallel federal obligations imposed by the FDCA and are not expressly or impliedly preempted under *Riegel*, *Buckman*, or 21 U.S.C. § 360k(a).

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT IV – BREACH OF EXPRESS WARRANTY**

123. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

124. At all relevant times, Defendant Boston Scientific Corporation expressly warranted, through its labeling, advertising, marketing materials, website representations, sales representatives, and field support personnel, that its spinal cord stimulator systems, including the WaveWriter Alpha system, were safe, effective, durable, supported by clinical data, and fit for the treatment of chronic pain conditions.

125. Due to the extensive direct communications between Boston Scientific personnel and Plaintiff, privity of contract existed between these two parties.

126. These express warranties included, but were not limited to, assurances that:

- The safety and effectiveness of the SCS systems was validated by clinical data or clinical evidence;
- The permanent SCS systems would provide greater or equivalent pain relief compared to the temporary trial SCS;
- The systems' multiwaveform stimulation technology provided superior pain relief without significant risk of adverse side effects;

- The devices were durable and appropriately designed for long-term implantation and therapeutic use without significant risks of lead migration, neurological injury, battery failure, rapidly declining efficacy, or stimulation-induced autonomic dysfunction;
- The system had been adequately tested for safety and effectiveness consistent with FDA requirements.

127. Such express warranties were made to Plaintiff's healthcare providers and directly to Plaintiff through Boston Scientific's promotional materials and field representatives.

128. Plaintiff and his healthcare providers reasonably relied on these express warranties in choosing to proceed with implantation of the Boston Scientific systems and in making ongoing treatment decisions.

129. Contrary to these express warranties, the SCS systems implanted in Plaintiff were defective, unreasonably dangerous, and incapable of delivering the promised therapeutic benefits. They were also not validated by clinical data, as represented to Plaintiff and his physicians. Instead, they caused Plaintiff to suffer injuries including persistent ineffective pain relief, nerve damage, device failure, stimulation-related complications, and ultimately, significant physical and emotional harm.

130. Defendant's conduct described herein breached its express warranties under Arizona law.

131. Under Arizona law, a manufacturer may be liable for breach of warranty if a product fails to perform as expressly warranted and causes harm.

132. Defendant's breaches of express warranty were a direct and proximate cause of Plaintiff's injuries, including physical pain, mental anguish, loss of enjoyment of life, additional medical expenses, and financial loss.

133. Plaintiff's claims for breach of express warranty are based on independent state-law duties and contractual obligations and are not expressly or impliedly preempted under federal law.

WHEREFORE, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, consequential and incidental damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT V – BREACH OF IMPLIED WARRANTIES**

134. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

135. Boston Scientific knew of the use that the WaveWriter Alpha system was intended for and impliedly warranted to Plaintiff and his healthcare providers that the systems were of merchantable quality and safe for the use for which they were intended, specifically the permanent implantation into human beings for the purpose of treating and relieving chronic pain.

136. Boston Scientific knew that, by holding the systems out as being approved by the FDA under the Premarket Approval process, physicians and patients would understand that the quality of the system was of a degree that was supported by clinical data and evidence of safety and effectiveness. Thus, Boston

Scientific impliedly warranted to Plaintiff and his physicians that the systems were supported by such evidence.

137. Plaintiff and his healthcare providers reasonably relied on these implied warranties in choosing to proceed with implantation of the WaveWriter Alpha systems and in making ongoing treatment decisions.

138. Contrary to these implied warranties, the systems were not of merchantable quality, safe for their intended use, or supported by clinical data or evidence of safety and effectiveness.

139. Defendant's breaches of implied warranties were a direct and proximate cause of Plaintiff's injuries, including physical pain, mental anguish, loss of enjoyment of life, additional medical expenses, and financial loss.

140. Plaintiff's claims for breach of implied warranties are based on independent state-law duties and contractual obligations and are not expressly or impliedly preempted under federal law.

WHEREFORE, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, consequential and incidental damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VI – FRAUDULENT MISREPRESENTATION**

141. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

142. At all relevant times, Defendant Boston Scientific Corporation, acting individually and through its agents, employees, and representatives, made material misrepresentations and omissions of fact regarding the safety, efficacy, and regulatory compliance of its spinal cord stimulator systems, including the WaveWriter Alpha systems implanted in Plaintiff.

143. Defendant communicated directly with Plaintiff and his physicians through sales representatives.

144. Defendant represented to Plaintiff, his healthcare providers, and the general public, through marketing materials, sales presentations, Instructions for Use (IFU), direct to patient communications, and other communications, that:

- The SCS systems were supported by clinical data and evidence of safety and effectiveness, as required for Premarket Approval, and was approved for sale based on such clinical data and evidence;
- The SCS systems were safe and effective for the long-term management of chronic pain;
- The permanent SCS systems would provide greater or equivalent pain relief compared to the temporary SCS trial;
- The devices' multiwaveform stimulation capabilities reduced the risk of therapy failure and side effects compared to older systems;
- The devices had been adequately validated and reviewed consistent with FDA requirements for significant design and functionality changes.

145. These material representations were false. Defendant knew or should have known, through reasonable investigation, post-market surveillance, and adverse event reporting, that:

- The SCS systems were not supported by clinical data or evidence of safety and effectiveness, as required for Premarket Approval, nor was it approved for sale based on such clinical data or evidence;
- The SCS systems were associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, device-related complications, and rapid decrease in efficacy over time;
- The permanent devices materially differed in performance and risk profile from the external trial device;
- Boston Scientific had not submitted adequate clinical evidence to substantiate the safety and effectiveness of its multiwaveform and posture-adaptive programming technologies;
- Boston Scientific's devices were being improperly marketed under serial PMA supplements rather than undergoing new PMA review as required by law.

146. Defendant made these material misrepresentations and omissions intentionally, willfully, recklessly, and with the intent to induce healthcare providers to recommend, and patients to consent to, implantation of its devices.

147. Plaintiff's healthcare providers justifiably relied on Boston Scientific's representations in recommending the SCS systems, and Plaintiff justifiably relied on the same representations in consenting to implantation and subsequent medical decisions.

148. Boston Scientific's field representatives directly interacted with Plaintiff and Plaintiff's care team and participated in programming the device. Their conduct reinforced the impression that the system was safe and effective

and that post-implantation adjustments would resolve complications. These communications omitted material facts and conveyed false assurances, including before the implantation and for years after the implantation.

149. Plaintiff had no reasonable means of independently discovering the falsity of Defendant's statements at the time of implantation, as Boston Scientific had superior knowledge of the device's design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

150. Plaintiff also had no reasonable means of independently discovering the falsity of Defendant's statements following implantation, as Boston Scientific had superior knowledge of the device's design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

151. Defendant's misrepresentations, including those made by sales representatives before the implantation procedure, caused Plaintiff to consent to the implantation of the SCS system.

152. Defendant, through its representatives, also made misrepresentations to Plaintiff about complications and inadequate pain relief he experienced after the permanent implant, representing to him that multiple reprogrammings would alleviate his complications and increase his pain relief. These representations were made at the time of the reprogrammings.

153. Defendant knew these post-implant representations to be false.

154. Defendant's misrepresentations, including those made by Boston Scientific representatives in the months following the implantation procedure caused Plaintiff to keep the SCS system in his body long after it had any efficacy and after he began to experience complications, because Defendant's representatives assured him it would work with more adjustments and programming. This led to greater harm than he would have suffered if he had the SCS removed earlier.

155. Plaintiff discovered the probable causal relationship between his injuries and Defendant's conduct only after experiencing continued device-related complications and reviewing public disclosures, adverse event reports, and litigation materials that contradicted Defendant's original representations.

156. As a direct and proximate result of Defendant's fraudulent misrepresentations and omissions, Plaintiff suffered significant injuries, including physical pain, emotional distress, medical expenses, lost income, diminished quality of life, and other consequential damages.

157. Plaintiff's fraud claims arise under Arizona common law, and are not based solely on FDCA violations, but rather Defendant's intentional misstatements and concealments made to induce reliance by Plaintiff and his physicians.

**WHEREFORE,** Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, punitive damages where permitted, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VII – NEGLIGENT MISREPRESENTATION**

158. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

159. At all relevant times, Defendant Boston Scientific Corporation, acting individually and through its agents, employees, and representatives, owed a duty to exercise reasonable care in communicating truthful, accurate, and complete information about its spinal cord stimulator systems, including the WaveWriter Alpha system.

160. Defendant supplied false information in its promotional materials, sales presentations, Instructions for Use (IFU), labeling, and direct communications to healthcare providers and patients regarding the safety, efficacy, design features, and regulatory status of the WaveWriter Alpha systems.

161. Specifically, Defendant negligently misrepresented that:

- The safety and efficacy of the SCS systems were validated by clinical data, as required for Premarket Approval, and was approved for sale based on such clinical data;
- The SCS systems was safe and effective for the long-term treatment of chronic pain;
- The systems' multiwaveform stimulation would enhance therapeutic outcomes and reduce adverse effects compared to previous devices;
- The permanent WaveWriter Alpha system would provide greater pain relief than the temporary SCS trial;
- The system had been appropriately validated through regulatory submissions consistent with FDA standards for safety and effectiveness.

162. Defendant made these representations without reasonable grounds for believing them to be true. A reasonable manufacturer exercising appropriate care would have known that:

- The SCS systems were not supported by clinical data or evidence of safety and effectiveness, as required for Premarket Approval, nor was it approved for sale based on such clinical data or evidence;
- The SCS systems were associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, and device-related complications;;
- The permanent implants differed materially in performance from the external trial device;
- The modified stimulation technologies and battery architecture introduced new and significant risks not present in predicate devices;
- Clinical data validating the long-term safety and efficacy of the device modifications were lacking or insufficient;
- Adverse event trends, including stimulation-related autonomic dysfunction, required disclosure to regulators and treating physicians.

163. Plaintiff's healthcare providers reasonably relied on Defendant's representations in recommending implantation of the SCS systems, and Plaintiff reasonably relied on the same representations in consenting to implantation.

164. Had Plaintiff and his healthcare providers been accurately and fully informed of the true risks and limitations associated with the device, they would not have elected to proceed with implantation or would have pursued alternative treatment options.

165. Defendant, through its representatives, also made misrepresentations to Plaintiff about complications and inadequate pain relief he experienced after the permanent implant, representing to him that multiple reprogrammings would alleviate his complications and increase his pain relief. These representations were made at the time of the reprogrammings.

166. Defendant knew or should have known that these post-implant representations were false.

167. Plaintiff relied on these representations in electing not to have the system removed earlier, causing him additional and continued injuries.

168. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff suffered physical injuries, emotional distress, additional medical expenses, financial losses, and diminished quality of life.

169. Plaintiff's negligent misrepresentation claims arise under state common law, including Arizona Common Law. These claims are not premised solely on FDCA enforcement and are not preempted under *Buckman* or *Riegel*.

**WHEREFORE**, Plaintiff demands judgment against Defendant Boston Scientific Corporation for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT IX – NEGLIGENCE PER SE FOR PRACTICING MEDICINE WITHOUT A LICENSE

***Against Defendant Boston Scientific***

(A.R.S. § 32-1455)

170. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

171. At all relevant times, Boston Scientific Corporation employed and deployed sales and clinical field representatives to assist in the surgical implantation and post-operative programming of its spinal cord stimulator systems, including the WaveWriter Alpha  system implanted in Plaintiff.

172. These field representatives, none of whom were licensed healthcare professionals in the State of Arizona , routinely and in Plaintiff's case:

- Entered surgical suites during spinal cord stimulator implantation procedures;
- Advised surgeons and operating room staff on intraoperative lead positioning and stimulation testing;
- Participated in real-time programming of the device based on patient response during surgery;
- Provided device setting recommendations to healthcare providers during post-operative care;
- Adjusted or instructed adjustment of device parameters that materially influenced treatment decisions;
- Directly advised patients, including Plaintiff, about the safety and efficacy of the SCS system, benefits of the system, and impacts of reprogramming the SCS system;

- Directly advised patients, including Plaintiff, to keep the SCS system in their body despite complications and lack of efficacy of the system;
- Provided medical advice to patients, including Plaintiff, regarding the SCS system, symptoms now alleged to be caused by the SCS system, and decisions related to the SCS system.

173. These activities constitute the unlicensed practice of medicine in violation Arizona law, which prohibit any person from diagnosing, treating, or recommending treatment for human ailments without a valid medical license.

174. Arizona law permits statutes to serve as evidence of reasonableness, and therefore, violation of statute to serve as evidence of a breach of the duty to act reasonably toward others.

175. Plaintiff was a member of the class of individuals these statutes were intended to protect.

176. The harms suffered by Plaintiff, including physical pain, are the type that these statutes are intended to prevent.

177. As a direct and proximate result of Defendant's statutory violations and its failure to adequately train, supervise, or restrict the conduct of its representatives, Plaintiff suffered harm, including but not limited to: improper lead placement, ineffective stimulation, neurological injury, permanent nerve damage, device-related complications, additional surgeries, and prolonged pain and suffering.

178. Defendant's conduct constitutes negligence per se under Arizona law and entitles Plaintiff to compensatory and punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Defendant Boston Scientific Corporation for compensatory and punitive damages, attorneys' fees where permitted, costs of suit, and all other relief the Court deems just and proper.

**COUNT X – NEGLIGENCE**

179. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

180. Defendant Boston Scientific is vicariously liable under Arizona law for all actions of its representatives taken in the course and scope of their employment with Boston Scientific.

181. Boston Scientific representatives that interacted with Plaintiff owed a duty of care to Plaintiff, including the duty to act reasonably and prudently toward Plaintiff so as not to cause him harm.

182. These representatives breached this duty of care by providing inaccurate and misguided medical advice regarding the Boston Scientific SCS system and complications Plaintiff experienced after being implanted with the system.

183. These representatives breached their duty of care by reprogramming Plaintiff's SCS system without sufficient knowledge, skill, and expertise to do so, and by continuing to reprogram the system after it should have been clear to them that the reprogramming was futile.

184. The breach of duty of these representatives proximately caused injury to Plaintiff, both because it proximately caused him to agree to be implanted with

the device and because it proximately caused him to elect to keep the device implanted in his body and undergo multiple reprogrammings, all while experiencing complications and poor pain relief.

185. The negligence of these representatives was willful and wanton, evidencing a conscious disregard for the rights of others and a desire to seek profits over patient safety. Therefore, punitive damages are appropriate.

186. Defendant Boston Scientific had a duty to reasonably and prudently hire, train, and supervise its employees, including the representatives that interacted with Plaintiff.

187. Defendant Boston Scientific breached its duty to reasonably and prudently hire, train, and supervise these employees.

188. If Defendant Boston Scientific had reasonably and prudently hired, trained, and supervised these employees, the representatives conduct described above would not have occurred and Plaintiff would not have been injured as a proximate result.

189. Therefore, Defendant Boston Scientific's failure to reasonably and prudently hire, train, and supervise these employees proximately caused Plaintiff's injuries.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Defendant Boston Scientific Corporation for compensatory and punitive damages, attorneys' fees where permitted, costs of suit, and all other relief the Court deems just and proper.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants Boston Scientific Corporation and award the following relief:

1. Compensatory damages for Plaintiff's physical injuries, emotional distress, pain and suffering, loss of enjoyment of life, past and future medical expenses, and other economic and non-economic losses in an amount to be determined at trial;
2. Consequential and incidental damages arising from Defendant's breach of express and implied warranties under Arizona law;
3. Punitive damages as permitted by Arizona and California law for Defendant's willful, fraudulent, and malicious conduct;
4. Reasonable attorneys' fees, costs of suit, and expenses incurred in this action as permitted by statute or common law;
5. Pre-judgment and post-judgment interest at the maximum rates permitted by law; and
6. Such other and further relief, whether at law or in equity, as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 22, 2026

Respectfully submitted,

/s/ Trevor B. Rockstad

Trevor B. Rockstad
trevor.rockstad@daviscrump.com
On Behalf of Wayne Rogers (Plaintiff)
CBN: 277274

Davis & Crump, P.C.
2601 14th Street
Gulfport, MS 39501
Ph: 228-863-6000